IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| JAMES ALBERT DELOACH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 1:21-cv-1121 (LMB/TCB) |
| | ) |
| ANTONY BLINKEN, Secretary, U.S. | ) |
| Department of State, | ) |
| | ) |
| Defendant.[1] | |

MEMORANDUM OPINION

Before the Court is a Motion for Summary Judgment (the "Motion") filed by defendant Antony Blinken ("Blinken" or "defendant") against pro se plaintiff James Albert DeLoach ("DeLoach" or "plaintiff"). [Dkt. No. 19]. For the reasons that follow, the Motion will be granted.

I. BACKGROUND

A. **Factual Background**[2]

Between April 2013 and October 2017, plaintiff, an African American male, served as an auditor in the Office of Audits within the U.S. Department of State's Office of Inspector General ("OIG"). [Dkt. No. 20] at ¶¶1, 5. The Office of Audits is broken into a number of different divisions, including the Information Technology ("IT") and Financial Management ("FM") Divisions, as well as an international division known as the Middle East Regional Operations ("MERO") Directorate, which has employees stationed in the Middle East and Frankfurt,

---

[1] Although the complaint named Michael Pompeo as defendant, Antony Blinken is Michael Pompeo's successor as Secretary of the U.S. Department of State and is therefore "automatically substituted as a party" pursuant to Fed. R. Civ. P. 25(d).

[2] The following facts are undisputed unless otherwise noted.

Germany. Id. at ¶3. Within months of joining the Office of Audits, plaintiff—then a GS-12—was selected for a temporary assignment in MERO's Islamabad Office, where he served starting in January 2014. Id. at ¶¶5-6; DEX H at 5.[3] In 2015, after plaintiff returned from that assignment, he was promoted to GS-13 and assigned to the IT division. [Dkt. No. 20] at ¶7. That same year, Trinh Nguyen joined the Office of Audits. DEX E at 2. During 2017, she was the Deputy Assistant Inspector General ("DAIG") for MERO, which meant that she managed the MERO directorate. Id. There is no evidence in the record that she ever supervised the defendant, who worked in a different division. Id. ("I did not have oversight of his work.").

In August 2017, MERO learned that it would soon have an opening in the three-person Kabul office. Id. at ¶8. Accordingly, on August 11, 2017, DAIG Nguyen emailed the Office of Audits' staff to solicit volunteers "at the GS-7, 9, 11, 12, and 13 level." Id. at ¶ 9; DEX A. The email stated that "the criteria" for selection would "be based on what is best for OIG's mission. Among other things, MERO will consider past/current performance, diversity, budget, [and the] needs of the current audit team." DEX A. By August 24, 2017, seven auditors, including plaintiff, had volunteered. DEX B. That same day, DAIG Nguyen emailed the list of the seven volunteers to four other OIG directors. Id. In the email, she indicated that she had spoken with Norman Brown, the Assistant Inspector General ("AIG") for the Office of Audits, "who said that the Kabul deployment is our decision. Based on everyone being relatively equal in qualification, we need to pick one. Remind me to discuss this with you all on Monday." Id.; [Dkt. No. 20] at ¶4.

On August 29, 2017, DAIG Nguyen submitted a two-page memorandum to AIG Brown "to lay out the selection process" she used to select Areeba Hasan for the position. DEX C at 1.

---

[3] DEX and PEX refer to defendant's and plaintiff's exhibits, respectively.

2

According to the memorandum, ultimately eight persons volunteered for the Kabul assignment, and DAIG Nguyen considered the following factors in making her decision:

> 1. **Prior deployments**—Because more auditors want to deploy than there are available positions, providing opportunities to those who have not deployed is an important consideration.
> 2. **Performance**—Working overseas requires auditors who excel at carrying out their responsibilities because reaching back to headquarters for assistance/resources/advice/guidance is often difficult due to the time difference and IT challenges.
> 3. **Budget Considerations**—With the current budget constraints, consideration must be given to the cost of moving auditors back and sending auditors to replace them.
> 4. **Diversity**—Teams who have diverse audit experience (e.g. different GS levels) make for stronger teams. Feedback from recent surveys shows that team members like to have entry-level staff so that they can exercise leadership and management skills.
> 5. **Balance of Specialized Experience**—Several auditors from the same directorate (such as IT or FM) requested deployments. If all were selected, they would leave that directorate short of auditors with specialized experience.
> 6. **Supervisory Input**—Beyond the official performance ratings, supervisory recommendation was also considered.
> 7. **Frankfurt's 3-year assignments**—Areeba Hasan and Malea Martin were previously selected to deploy to the Frankfurt field office. However, after learning that they could not be promoted while they served their 3-year assignments, they pulled out. OIG is currently looking into the situation. The timing of OIG's determination is unknown.

Id. at 1-2. In addition, the memorandum contained the following table summarizing for each volunteer their GS-level, division, whether "this [would] be their 1st deployment," and whether "they receive[d] an Exceeds or Higher performance rating":

| Name | Grade | Division | Will this be their 1st deployment? | Did they receive an Exceeds or Higher performance rating? |
|---|---|---|---|---|
| Malea Martin | GS-9 | MERO | yes | No rating in 2016; supervisor gives Exceeds in mid-year |
| Areeba Hasan | GS-9 | MERO | yes | No rating in 2016; supervisor gives Exceeds in mid-year |
| Taylor Westfall | GS-9 | MERO | yes | No rating in 2016; supervisor gives Exceeds in mid-year |
| Aaron Caffrey | GS-7 | MERO | yes | No rating in 2016; supervisor gives Exceeds in mid-year |
| Jahmai Nicome | GS-11 | FM | yes | No rating in 2016; supervisor gives Meets Expectations in mid-year |
| Nikiya Knight | GS-13 | IT | yes | No rating in 2016; supervisor gives Meets Expectations in mid-year |
| Dan Brady | GS-7 | IT | yes | No rating in 2016; supervisor gives Exceeds in mid-year |
| James Deloach | GS-13 | IT | No | Exceeds |

Id. at 2.

This table indicated that only plaintiff and one other volunteer were at the highest GS-level (13) and plaintiff was the only volunteer who had already deployed overseas. Id. The table also indicated that plaintiff was the only volunteer with a rating in 2016. Id. In contrast, the other volunteers only had "mid-year" evaluations.[4] Id. The table erroneously indicated that plaintiff "exceeds" expectations, although his actual rating was "outstanding," the highest possible rating. Id.; [Dkt. No. 23] at ¶11; PEX B at 5. Of the remaining seven volunteers, five exceeded expectations, and two met expectations. DEX C at 2.

Based on the foregoing criteria, DAIG Nguyen recommended to AIG Brown that Areeba Hasan, a GS-9 auditor from the MERO division who DAIG Nguyen described as a "brown"

---

[4] DAIG Nguyen stated in an EEO Investigative Affidavit, dated August 2, 2018, that when she discussed the decision with her directors, "concerns were expressed about these new staff not having worked a full year at OIG to get an official rating. However, one of the directors said that the midyear rating is considered official." DEX E at 4. In addition, DAIG Nguyen stated that "[i]t was unlikely that any of the staff would deploy sooner than 6 months. If in the next 6 months the selected staff's performance decrease[s], we can pull the deployment orders and start the process over." Id.

4

female, be deployed to Kabul. Id.; DEX E at 7. She explained, "The reasons are: (1) she received an "Exceeds Expectations" at midpoint, (2) she has not deployed before, (3) she was selected to deploy to Frankfurt (but pulled out because of the lack of promotion opportunities), and (4) supervisory recommendations (e.g. directors thought the timing was best with Areeba)." DEX C at 2.

On September 20, 2017, DAIG Nguyen emailed plaintiff to inform him that he was not selected. DEX D at 1-2. When plaintiff asked for "the reason for the final decision," DAIG Nguyen followed up by explaining that "[f]actors include performance, prior deployments, office needs (the receiving team and the team where the staff is leaving), diversity in experience, among others." Id.

### B. Procedural History

On December 14, 2017, plaintiff filed a formal complaint of discrimination with the U.S. Department of State's Office of Civil Rights ("OCR"), alleging, among other things, that the Office of Audits did not select him for the temporary assignment to Kabul based on his race (African American), color (black), and gender (male).[5] [Dkt. No. 20] at ¶13. To facilitate the investigation, DAIG Nguyen submitted an affidavit stating, in relevant part, that she was the "final decision maker," that she "made the final decision" to select Hasan "after having spoken to my directors" on August 28, 2017, and that "[t]he consensus was that they wanted to give the opportunity to new staff." DEX E at 4. As to the significance of this factor, AIG Brown submitted an affidavit stating that he had "repeatedly discussed with my staff—including [DAIG] Nguyen—the importance of spreading these opportunities to as many of our staff

---

[5] Plaintiff raised nine claims of discrimination to OCR; however, only one—the one now before the Court—was timely. DEX I at 1. The EEOC affirmed OCR's dismissal of the other eight claims. Id.

5

members as possible (i.e., not selecting the same staff members for temporary overseas assignments) . . . [because] allowing more individuals to serve in these temporary positions serves the interest of our organization." DEX K at ¶4. In addition, DAIG Nguyen stated that because the two other employees in Kabul were GS-13 and GS-14, she "wanted some diversity in grade to allow the[m] . . . to have opportunities to lead someone junior." DEX E at 5. Although all four directors who DAIG Nguyen emailed on August 24, 2017, told OCR that they did not have any input in the Kabul deployment decision, they did not indicate whether or not they had read her email. PEX A; DEX I at 5-6.

On April 17, 2019, OCR issued a Final Agency Decision, concluding that plaintiff "failed to prove his case of discrimination based on race, color, or sex because he failed to provide evidence of a nexus between his protected categories and the treatment he received." DEX I at 10-11. Plaintiff appealed to the Equal Employment Opportunity Commission's Office of Federal Operations, which affirmed OCR's Final Agency Decision on September 10, 2020, and concluded that defendant provided legitimate, non-discriminatory, and non-pretextual reasons for selecting Hasan over plaintiff. DEX J at 3-4.

On December 14, 2020, plaintiff filed a pro se complaint in the United States District Court for the District of Columbia alleging that the U.S. Department of State discriminated against him on the basis of race, color, and sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., when it did not select him for the temporary assignment in Kabul. [Dkt. No. 1]. After defendant filed a Motion to Dismiss or, Alternatively, to Transfer [Dkt. No. 8], the court transferred the case to this district without ruling on the merits of the Motion to Dismiss. On October 25, 2021, defendant filed the pending Motion for Summary Judgment, which is now fully briefed and ripe for review. Finding that oral argument would not

assist the decisional process, the Motion will be resolved on the papers submitted, and for the reasons explained below, defendant's Motion will be granted.

## II. DISCUSSION

### A. **Standard of Review**

A motion for summary judgment should be granted only if, after viewing the entire record in the light most favorable to the nonmoving party, the Court finds that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 185 (4th Cir. 2004). The movant is entitled to judgment as a matter of law if the movant demonstrates that the "nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), and the nonmovant fails to "come forward with 'specific facts showing that there is a genuine issue for trial,'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (emphasis omitted)). There is no genuine issue for trial "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Id. at 587.

### B. **Analysis**

The dispositive question before the Court is whether there is sufficient evidence—either direct or circumstantial—to permit a reasonable factfinder to conclude that defendant's decision to select someone other than plaintiff for the Kabul assignment was motivated by plaintiff's race, color, or sex. See Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 318 (4th Cir. 2005). Although plaintiff claims that he has "direct evidence" of defendant's discriminatory motivation, the record belies that assertion. Direct evidence generally "consists of express statements by decision-makers that the plaintiff's [protected status] was a motivating factor in

causing the adverse employment decision." Minter v. United Airlines, Inc., No. 1:16-cv-1012, 2017 WL 5634635, at *4 (E.D. Va. Mar. 24, 2017) (quoting Hughes v. Navy Fed. Credit Union, No. 1:10-cv-1430, 2012 WL 32404, at *8 (E.D. Va. Jan. 4, 2012)). Plaintiff does not point to any such statements by DAIG Nguyen or any other evidence which would constitute direct evidence of a discriminatory animus.

Lacking any direct evidence of discrimination, the Court will apply the burden-shifting scheme under McDonnell Douglas Corp. v. Green, under which plaintiff carries the initial burden of establishing a prima facie case of discrimination. 411 U.S. 792, 802 (1973). Because neither the parties nor the Court has identified Fourth Circuit precedent establishing the elements of a discrimination claim based on the denial of a temporary assignment, the Court will apply the prima facie elements for a discriminatory denial of transfer claim, which appears factually analogous.[6] That claim requires a plaintiff to show that (1) he is a member of a protected group; (2) he applied for the position in question; (3) he was qualified for the position; and (4) he was rejected for the position "in favor of someone not a member of the protected group under circumstances giving rise to an inference of unlawful discrimination." Burgess v. Bowen, 466 F. App'x 272, 281-82 (4th Cir. 2012). If plaintiff carries that burden, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." McDonnell Douglas Corp., 411 U.S. at 802. "Once such a neutral reason is

---

[6] As a threshold matter, the government assumes that plaintiff's non-selection for a temporary assignment is an actionable "personnel action" under Title VII, given that it carried additional pay and benefits. [Dkt. No. 20] at 9 n.3; Abdelhamid v. Sec'y of the Navy, 525 F. Supp. 3d 671, 684 (E.D. Va. 2021) (defining "personnel action," in relevant part, as an employment decision "causing a significant change in benefits" (quoting Hoyle v. Freightliner, LLC, 650 F.3d 321, 337 (4th Cir. 2011)). It is also a "detail, transfer, or reassignment" under the definition of "personnel action" in the Civil Service Reform Act. Babb v. Wilkie, 140 S. Ct. 1168, 1173 (2020).

proffered, the burden reverts to the plaintiff to establish that the employer's non-discriminatory rationale is a pretext for intentional discrimination." Heiko v. Colombo Savings Bank, F.S.B., 434 F.3d 249, 258 (4th Cir. 2006) (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000)).

Defendant does not dispute that plaintiff can establish the first three elements of his prima facie case, as he was a black male who applied for the Kabul assignment and was unquestionably qualified for it as a GS-13 auditor whose performance was rated as outstanding; however, defendant does dispute that plaintiff has satisfied the fourth element, that he was rejected for the assignment "in favor of someone not a member of the protected group under circumstances giving rise to an inference of unlawful discrimination." Plaintiff argues that he has satisfied the fourth element of his prima facie case because "the total sum of DAIG Nguyen's testimony combined with her actions in the selection process demonstrates unlawful discrimination, and [that] a reasonable inference to be drawn [is] that discrimination occurred." [Dkt. No. 23] at 9. In other words, plaintiff relies on the same arguments to establish his prima facie case as he does to support his argument that defendant's proffered reasons for its decision was in fact a pretext for discrimination.

Assuming plaintiff has established a prima facie case, the burden shifts to defendant to articulate a legitimate, non-discriminatory reason for plaintiff's non-selection. In this case, defendant argues that plaintiff was not selected because DAIG Nguyen considered seven facially neutral criteria and, based on those criteria, determined that another candidate was a superior choice. Taken at face value, defendant's criteria, such as prior deployments, are not unlawful. Employers have "discretion to choose among equally qualified candidates" based on lawful criteria. Texas Dep't of Comm. Affairs v. Burdine, 450 U.S. 248, 259 (1981).

Whether the criteria cited by DAIG Nguyen were the "real reason[s]" for plaintiff's non-selection is a different question, and the crux of the dispute. Hawkins v. PepsiCo, Inc., 203 F.3d 274, 278 (4th Cir. 2000). Defendant argues that there are two reasons why no reasonable factfinder could conclude that defendant's rationale was pretextual. First, the evidence is insufficient to establish that plaintiff was a demonstrably better fit for the Kabul assignment than Hasan. See Heiko, 434 F.3d at 259, 261 (finding sufficient evidence of pretext where "plaintiff has made a strong showing that his qualifications are demonstrably superior"). Second, there are no inconsistencies in DAIG Nguyen's statements that would undermine the credibility of her stated reasons for picking Hasan, a brown female, over plaintiff, a black male. See E.E.O.C. v. Town & Country Toyota, Inc., 7 F. App'x 226, 233 (4th Cir. 2001) ("Contradictions between an employer's proffered explanation and the contemporaneous statements of the employer are convincing evidence of pretext."). Having reviewed the record in the light most favorable to plaintiff, the Court agrees with defendant on both fronts.

Although there is evidence upon which a jury could find that plaintiff had more experience and better performance reviews than the other volunteers, those were not the only criteria for selection, and the Court must "assess relative job qualifications based on the criteria that the employer has established as relevant to the position in question." Heiko, 434 F.3d at 259. In addition to experience and performance evaluations, DAIG Nguyen considered it important to give the opportunity to an auditor who "ha[s] not deployed" and who was not the same GS level as the two auditors already in Kabul, who were GS-13 and GS-14, to promote "diverse audit experience" and allow the senior Kabul auditors to "exercise leadership and management skills." Given these considerations, plaintiff cannot show that he was superior to Hasan with respect to these two factors, because he had previously deployed and was the same

GS level (13) as one of the auditors in Kabul.[7] Plaintiff also cannot establish that the "balance of specialized experience" factor unquestionably favored him over Hassan. To the contrary, the evidence provides a legitimate reason that the "balance of specialized experience factors" would weigh against the selection of plaintiff or the other volunteers from the IT and FM directorates. DAIG Nguyen stated in her memorandum that "several auditors from the same directorate . . . requested deployments" and she needed to ensure that the IT and FM directorates did not lose too many auditors to deployments.

Moreover, plaintiff's reliance on his "outstanding" performance is misplaced. Even if he were OIG's best auditor, there is no evidence in this record that OIG was looking for the best auditor to fill the Kabul assignment. Instead, the evidence shows that OIG simply wanted to deploy an auditor who had scored above a certain performance threshold, presumably because anyone above that threshold could "excel at carrying out their responsibilities [without] reaching back to headquarters for assistance." That is why DAIG Nguyen's memorandum indicates she asked, for each volunteer, "Did they receive an Exceeds or Higher performance rating?" The question demonstrates that the difference between an "exceed" rating and "outstanding" rating did not make a difference for the selection process as long as the volunteer scored one of them. Indeed, several volunteers who scored below that threshold were not selected. Plaintiff points to an error in DAIG Nguyen's rating chart as evidence of her bias against him. Specifically, he complains that although his performance rating was actually "outstanding," DAIG Nguyen listed it as "exceeds." Because the difference between an "Exceeds" or "Outstanding" rating was not material, plaintiff's argument that DAIG Nguyen purposely "lowered" his rating is

---

[7] Ironically, to the extent that plaintiff focuses on the lack of experience the volunteer who was chosen had with the Department of State, see [Dkt. No. 1-1] at 1, he ignores that he was selected for deployment to Islamabad only months after joining the office.

inconsequential. There is no evidence that a rating of "outstanding," rather than "exceeds," would have changed how plaintiff's candidacy was viewed.

In addition, although plaintiff points to several inconsistencies in DAIG Nguyen's memoranda and statements, they are "pinprick objections" that fail to undermine the credibility of her reasons for picking Hasan over plaintiff. Hux v. City of Newport News, 451 F.3d 311, 313 (4th Cir. 2006). First, plaintiff points out that when DAIG Nguyen initially announced the assignment opportunity in her August 11, 2017, email, she did not list not having previously deployed among the stated "criteria"; however, it was subsequently listed as a factor in her August 29, 2017, memorandum, and her September 20, 2017, email informing plaintiff that he was not selected. Plaintiff argues that a reasonable factfinder could find that "prior deployments" did not become a qualifier until DAIG Nguyen received a list of volunteers, and it was adopted to eliminate only him because he was the only volunteer who had a prior deployment. There is no inconsistency between DAIG Nguyen's initial email and defendant's explanation for not selecting plaintiff. The initial email did not purport to be an exclusive list of the relevant criteria, as it clearly stated, "Among other things, MERO will consider past/current performance, diversity, budget, needs of the current audit team." (Emphasis added). The phrase "Among other things" explicitly signaled that MERO would consider additional criteria. More importantly, plaintiff has not produced any evidence contradicting the evidence showing that defendant had a goal of evenly distributing deployment opportunities by using "prior deployments" as a selection consideration. In fact, AIG Brown stated in an affidavit that he has "repeatedly discussed with [his] staff," including DAIG Nguyen, "the importance of spreading these opportunities to as many of our staff members as possible."

Second, plaintiff points to the inconsistency between DAIG Nguyen recalling having discussed selection for this assignment with other OIG directors, and the statements from four directors to EEO investigators that they did not have any input in the decision. Although this is certainly an inconsistency, plaintiff does not explain how it is probative of race, color, or gender discrimination. Moreover, it does not show that DAIG Nguyen concealed the selection process from her peers. To the contrary, in her email dated August 24, 2017, which was sent before DAIG Nguyen made her selection, she provided the list of what was then seven applicants to four OIG directors—the same four directors who could not recall having any input in the decision—in which she wrote, "Remind me to discuss this with you all on Monday."

Third, plaintiff relies on what he calls defects in the selection process; however, these alleged defects would "not constitute evidence of pretext because the failures would affect all candidates equally." Russell v. Sessions, No. 1:18-cv-163, 2018 WL 4137018, at *3 (E.D. Va. Aug. 29, 2018). For example, he argues that DAIG Nguyen's seemingly informal selection process conflicted with the OIG policy that "generally speaking" required a panel to interview volunteers before "mak[ing] recommendations to [DAIG] Nguyen." PEX D at 3. Similarly, plaintiff objects that when DAIG Nguyen sent her memorandum reporting the selection of Hasan to AIG Brown, she did not offer "supporting documentation."[8] Again, other than his view of "supporting documentation," there is no evidence in the record supporting a conclusion that this alleged deficiency disadvantaged plaintiff in a different way than it would have disadvantaged the other candidates who were not selected. And although plaintiff alleges that DAIG Nguyen did not contact his supervisors for a recommendation, he has not presented any evidence that he

---

[8] Plaintiff does not describe what he means by "supporting documentation," but a review of the memorandum shows AIG Brown was provided some information about all the volunteers.

13

was the only candidate whose supervisors were not contacted. None of these discrepancies are probative of pretext because none identify a discrepancy that uniquely cut against plaintiff.

Fourth, plaintiff points to an inconsistency created by a footnote in defendant's opening brief, stating that DAIG Nguyen "did not actually know either Hasan's or plaintiff's specific race." [Dkt. No. 20] at 10 n.4. That statement is not accurate. Although DAIG Nguyen stated in an EEO Investigative Affidavit that she was "not sure" what Hasan's race was, she stated that she understood plaintiff's race to be African American. DEX E at 3, 7. Nonetheless, this does not advance plaintiff's case, because DAIG Nguyen never contradicted herself. The contradiction is between something DAIG Nguyen said and an erroneous description of the evidence by defendant's counsel.

Because defendant has come forward with evidence of nondiscriminatory reasons for not selecting plaintiff for the temporary overseas assignment, the burden shifted to plaintiff to produce evidence showing the reasons were pretextual. Plaintiff has not met that burden. His only evidence is his personal opinion about his qualifications and his belief as to what the proper selection criteria should have been. This is simply not sufficient evidence from which a reasonable jury could find that he was not selected because of his race, skin color, or sex.

### III. CONCLUSION

Federal courts "do[] not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination . . . ." DeJarnette v. Corning Inc., 133 F.3d 293, 299 (4th Cir. 1998) (quoting Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 410 (7th Cir. 1997)). Instead, a court's task is limited to determining whether the employer violated antidiscrimination law in making the particular personnel decision at issue. In this regard, the Court finds no evidence of

such discrimination. For the reasons stated above, defendant Antony Blinken's Motion for Summary Judgment [Dkt. No. 19] will be granted by an appropriate Order to be issued with this Memorandum Opinion.

Entered this 4th day of March, 2022.

Alexandria, Virginia

/s/
Leonie M. Brinkema
United States District Judge

15